[L. A. Nos. 15737 and 15738. In Bank.—July 24, 1936.]

WILLIAM L. ANDERSON, Respondent, v. I. M. JAMESON CORPORATION et al., Appellants.

FRANK J. HERNANDEZ, Respondent, v. I. M. JAMESON CORPORATION et al., Appellants.

62

Black, Hammack & McWilliams and Alfred L. Black, Jr., for Appellants.

Oscar Richard Cummins and Harry C. Cogen for Respondents.

THE COURT.—These actions were brought to recover damages for personal injuries received when an automobile driven by plaintiff Anderson, with plaintiff Hernandez as guest, collided with a cow. Plaintiffs relied upon the doctrine of *res ipsa loquitur* to establish a *prima facie* case of negligence against defendant. Defendant admitted ownership of the cow but denied negligence and also pleaded contributory negligence of plaintiffs. The cases were consolidated for trial. At the close of plaintiffs' evidence, defendant made motions for nonsuit, which were denied. When both parties rested, defendant moved for directed verdicts, which were also denied. The jury returned a $5,000 verdict for plaintiff Anderson and a $2,500 verdict for plaintiff Hernandez. Thereafter motions by defendant for judgment notwithstanding the verdicts were denied and judgments were entered for plaintiffs, from which defendant appealed on a single transcript.

Appellant contends (1) that the trial court erred in denying the motions for nonsuit, directed verdict, and judgment notwithstanding the verdict, there being in effect no statute or ordinance which would impose a specific duty upon defendant, and (2) that the evidence adduced was insufficient to establish negligence on the part of defendant, but did

conclusively establish contributory negligence as a matter of law on the part of plaintiff Anderson. No claim is made that the verdicts are excessive.

The material facts surrounding the happening of the accident are undisputed. The accident occurred between 10:30 and 11 o'clock on the night of March 3, 1933. Plaintiff Anderson, accompanied by plaintiff Hernandez, was proceeding southerly about six miles out of Mojave on State Highway No. 23. Through this territory the highway was a straight, practically level, ordinary, concrete surfaced fifteen-foot desert highway, bordered on the west by a barbed-wire fence stretching some six miles north and eight miles south from point of collision and bordered on the east by a main track right of way of the Southern Pacific Railroad, fenced on both sides. Just prior to the collision with the cow, a truck approaching plaintiffs from the opposite direction lowered its headlight beams and plaintiff Anderson did likewise, but neither driver dimmed or cut the brilliancy of the headlights. Plaintiff Anderson first noted the presence of the cow on the highway some fifty feet ahead when the eyes of the animal caught the reflection of the headlights. He was able to apply his brakes only for an instant before the collision, his opportunity to dodge around the animal being hampered by the approach of the truck. The cow was of a reddish brown color, with no white or distinguishing marks and neither the truck driver nor plaintiff Hernandez saw it prior to moment of impact. The force of the blow caused the automobile to go out of control and turn over, severely injuring plaintiffs. The cow was killed.

Plaintiffs produced no evidence accounting for the presence of the cow on the highway, but invoked the doctrine of *res ipsa loquitur* to establish a *prima facie* case of negligence against defendant. The propriety of permitting application of that doctrine in cases of this character was upheld in *Kenney v. Antonetti*, 211 Cal. 336, 338, 339 [295 Pac. 341], where this court said: ''Section 151 of the California Vehicle Act (Act 5128, Deering's General Laws; Stats. 1923, p. 517) in part provides in substance that no person owning or controlling livestock shall voluntarily or negligently permit any of them to stray or remain unaccompanied upon a fenced public highway and section 1714 of

the Civil Code in part provides in substance that everyone is responsible for an injury occasioned to another by his want of ordinary care or skill in the management of his property. The fact that defendants' horses were unattended upon the highway at night and the other facts adduced by the evidence, considered in the light of the above provisions and the further general rules of negligence applying at all times, clearly gave rise to an inference of negligence here and sufficiently established plaintiffs' *prima facie* case. It was not incumbent upon her to prove just how the horses came to be loose or who permitted them to enter the highway for this was obviously a fact peculiarly within the knowledge of defendants. In the exercise of ordinary care, how could it be possible for horses to stray time and again unattended upon the highway, as plaintiff attempted, by the evidence stricken out, to show it was the custom of defendants' horses to do? The theory of the doctrine of *res ipsa loquitur* is that a defendant in charge of an instrumentality which causes injury either knows the cause of the accident or has the best opportunity of ascertaining it, and the plaintiff, having no such knowledge, is compelled to allege negligence in general terms and to rely upon proof of the happening of the accident in order to establish it (19 Cal. Jur., sec. 127, p. 713).'' Citing *Breidenbach* v. *McCormick Co.*, 20 Cal. App. 184 [128 Pac. 423]; *Roberts* v. *Griffith Co.*, 100 Cal. App. 456 [280 Pac. 199]; *Olden* v. *Babicora Dev. Co.*, 107 Cal. App. 399 [290 Pac. 1062]; *Hansen* v. *Kemmish*, 201 Iowa, 1008 [208 N. W. 277, 45 A. L. R. 499, and note]; *Doherty* v. *Sweetser*, 82 Hun, 556, [31 N. Y. Supp. 649]. See, also, *Moss* v. *Bonne Terre F. & C. Co.*, 222 Mo. App. 808 [10 S. W. (2d) 338].

Appellant, however, contends that the rule of the Kenney case (*Kenney* v. *Antonetti, supra*) is not applicable here for the reason that in 1933 the legislature repealed the statute upon which that action was bottomed (sec. 151, California Vehicle Act, referred to in above quotation), and, with certain changes which we are asked to construe as foreclosing reliance upon the doctrine of *res ipsa loquitur*, incorporated its provisions in the Agricultural Code, as section 423 thereof (Act 144, Deering's 1933 Supp., p. 875). The effective date of said section 423 was subsequent to the happening of this accident but prior to trial of these actions

and appellant contends that inasmuch as the change was procedural only—not affecting substantive rights but going only to the remedy for enforcement of those rights—it is entitled to the benefit of the statute as it existed at the time of trial. (*Pilcher* v. *Tanner Motor Livery*, 138 Cal. App. 558 [33 Pac. (2d) 58], and cases there cited.)

We find it unnecessary to pass upon the latter contention as it is our view that the reenactment effected no change in the existing law—procedural or otherwise—which is applicable here; that is, the changes incorporated in section 423 have no bearing upon this case.

The former section (sec. 151, Act 5128, Deering's Gen. Laws, vol. II, p. 2524) read in part: "No person owning, or controlling the possession of, any livestock, shall voluntarily or negligently permit any such livestock to stray upon or remain unaccompanied by a person in charge or control thereof upon a public highway, both sides of which are adjoined by property which is separated from such highway by a fence. . . ." The enactment, section 423, *supra,* substituted the word "willfully" where the word "voluntarily" appears in the first sentence of section 151, and added the following provision: "In any civil action, brought by the owner or driver of a motor vehicle for damages caused by collision with any domestic animal or animals on a highway, there is no *presumption* that such collision was due to negligence on behalf of the owner of such livestock."

Appellant contends that in cases where section 423 applies, the effect of the provision last quoted is to preclude reliance upon the doctrine of *res ipsa loquitur*. In making this contention appellant recognizes the established rule in this state (19 Cal. Jur., sec. 123, pp. 704, 705) that application of said doctrine raises merely an *inference* of negligence, not a *presumption,* but urges that it is obvious that the legislature used the word "presumption" in the sense and meaning of "inference" and that the clause should be so interpreted in order to give it purpose and meaning. Appellant points out that the two words have at times been used interchangeably and confused and that an inaccurate use of the terms has been acknowledged by the courts themselves. (*Even* v. *Pickwick Stages System*, 109 Cal. App. 636 [293 Pac. 700], and cases therein cited.)

■ We find no ground upon which we would be warranted in interpreting the word "presumption" as used in the statute, to include the word "inference". The two terms are far from synonymous and their distinctive definitions are given in the Code of Civil Procedure. Section 1957 of that code provides: "Indirect evidence is of two kinds: 1. Inferences; and 2. Presumptions." Section 1958 states: "An inference is a deduction which the reason of the jury makes from the facts proved, without an express direction of law to that effect." Section 1959 states: "A presumption is a deduction which the law expressly directs to be made from particular facts." While, as appellant asserts, the terms have at times been confused, yet it is equally true that when used in connection with the definition and application of the doctrine of res ipsa loquitur, the distinction between them is clear cut and has been consistently recognized throughout the decisions of our courts. To emphasize this statement, it should be noted that in different jurisdictions there is a conflict of authority on the precise question of "whether the rule 'res ipsa loquitur', when applicable, is to be given the dignity of a presumption, which, if unrebutted, requires a verdict for the plaintiff, or whether it merely permits, but does not require, the jury to draw an inference of negligence". (53 A. L. R., note, p. 1494, pp. 1511–1519.) California has long been numbered among those jurisdictions which adhere to the doctrine as raising merely an inference of negligence, not a presumption. Any number of cases may be found wherein this distinction is expressly referred to and discussed. " . . . The mere proof of the happening of the accident while the automobile was in the exclusive possession of defendant, and that deceased was killed in said accident, raises an inference of negligence on the part of defendant,—not a presumption as claimed by appellants. . . . (Citing many cases.) . . . The difference between an evidentiary presumption and an evidentiary inference is simply this, that when the law requires the jury to draw a certain designated conclusion from particular evidence, that conclusion so forced upon the jury is a presumption. Where mandatory presumptions are not exacted, it is the right and duty of the jury to draw such reasonable inferences from the evidence as may appeal to and satisfy their minds." (Crooks v.

*White,* 107 Cal. App. 304, 310, 311 [290 Pac. 497]; *Thomas*
v. *Visalia etc. Co.,* 169 Cal. 658 [147 Pac 972].   See, also,
*Dowd* v. *Atlas Taxicab & Auto Service Co.,* 187 Cal. 523,
532 [202 Pac. 870]; *O'Neill* v. *San Francisco,* 209 Cal. 418
[287 Pac. 449]; *Ireland* v. *Marsden,* 108 Cal. App. 632 [291
Pac. 912]; *Lawrence* v. *Pickwick Stages,* 68 Cal. App. 494,
498 [229 Pac. 885]; *Seney* v. *Pickwick Stages,* 82 Cal. App.
226 [255 Pac. 279]; *Hilson* v. *Pacific G. & E. Co.,* 131 Cal.
App. 427, 437 [21 Pac. (2d) 662]; *Gritsch* v. *Pickwick Stages
System,* 131 Cal. App. 774, 783 [22 Pac. (2d) 554].)

It must be assumed that the legislature was cognizant of
the correct meaning and use of the terms and that it drafted
its enactment in the light of the code provisions and de-
cisions of the courts of this state relating thereto, particu-
larly where the legislation dealt with so technical a subject
as rules of evidence, which vary with the use or omission of
a single term.   As said in *Estate of Garthwaite,* 131 Cal.
App. 321, 325 [21 Pac. (2d) 465]: "It is also a presump-
tion that in exercising its prerogative in enacting laws the
legislature does so in view of, and with reference to, existing
laws and judicial decisions; and that a particular statute
was enacted by it 'in the light' of such judicial decisions
as had a direct bearing upon such statute.   (23 Cal. Jur.
782, and authorities there cited.)"

Furthermore, even though the legislature may have
thought that the term "presumption" would include the
term "inference", that was not so, and the statute as
actually enacted did not contain the latter term.   It may
not be inserted therein under the guise of interpretation.
In a late case this court said: "It is probably safe to assume
that the legislature had in mind . . . (a certain proviso)
. . . but the difficulty is that they have not expressed this
intent in the language used.   This court has no power to
rewrite the statute so as to make it conform to a presumed
intention which is not expressed.   This court is limited
to interpreting the statute, and such interpretation must be
based on the language used.   By the express provisions of
section 1858 of the Code of Civil Procedure, 'In the con-
struction of a statute . . . the office of the judge is simply
to ascertain and declare what is in terms or in substance con-
tained therein, not to insert what has been omitted or to
omit what has been inserted . . . '   It is elementary that

there can be no intent in a statute not expressed in its words; that the intention of the legislature must be determined from the language of the statute. (Citing cases.) . . . 'It is a cardinal rule in the construction of statutes that the intent of the legislator should be followed, but this is subject to the imperative and paramount rule that the court cannot depart from the meaning of language which is free from ambiguity, although the consequence would be to defeat the object of the act.' " (*Seaboard Acceptance Corp.* v. *Shay,* 214 Cal. 361, 365, 366 [5 Pac. (2d) 882].) See, also, *Schofield* v. *City of Los Angeles,* 120 Cal. App. 240, 245 [7 Pac. (2d) 1076].

Our view is strengthened by the fact that the legislature itself in 1935 inserted in the statute the omitted term, amending the provision in question to read: "In any civil action brought by the owner, driver or occupant of a motor vehicle . . . for damages caused by collision between any motor vehicle and any domestic animal or animals on a highway, there is *no presumption or inference* that such collision was due to negligence on behalf of the owner, or the person in possession of such livestock." (Deering's 1935 Supp., pp. 402, 403.) This amendment indicates that the legislature realized that it had not included the word "inference" in the 1933 provision, and that the insertion of said term was a legislative function. We may add that we do not find it necessary in this case to pass upon the reasonableness of the classification made by the 1933 and 1935 statutory changes for the reason that the only provisions here applicable are those common to both the original section 151 and section 423, as enacted in 1933.

The trial court properly permitted reliance upon the doctrine of *res ipsa loquitur* and there was no error in denial of the motions for nonsuit.

█ This brings us to a consideration of appellant's contention that the trial court erred in denying its motions for directed verdict and judgment notwithstanding the verdict, which requires an examination of the sufficiency of the evidence adduced on behalf of appellant to meet the *prima facie* case established by plaintiffs.

The territory surrounding the scene of the accident was desert grazing land, much of which was unfenced. Appellant was the owner of 900 to 1,000 head of cattle and,

following the custom of local cattlemen, turned this herd loose on said grazing land from late fall to early spring. Thus some 600 square miles of grazing land east of the highway and fenced railroad right of way were used by appellant in common with three other cattle owners for the grazing of some 2,500 stock. The water holes for these animals were located three to four miles east of the highway. The grazing land on the west side of the road was not used by appellant, but was used by neighboring ranchers owning from 200 to 500 stock. There were several gates along the westerly fence and also gates and a cattle guard in the easterly fence, but farther from the scene of the accident, and beyond was open country. No control over or duty to maintain any fence was shown to be in appellant. However, the cattle were known to stray and the gates were frequently left open by persons unknown. Therefore the cattlemen employed cowboys to care for the stock, guard against straying and patrol the highway, shutting gates found open in either the westerly or easterly fence. Sometimes a herder would have to close a gate on both his outgoing and return trip or when traveling the highway by automobile in the early evening.

D'espite the frequency with which the gates were found open, no herders were on duty after 8 or 9 o'clock in the evening. Indeed, appellant and its associates employed only six or eight cowboys to guard the 2,500 cattle over said 600 square miles area, 30 miles long and 20 miles wide, while the cattlemen using the westerly territory employed two to four cowboys to guard from 200 to 500 head. Although the cattle had to come to the main watering places, nevertheless, so appellant's witnesses testified, they roamed "all over the country"—"one of the big difficulties cattlemen have is to keep cattle from straying out of reasonable bounds". It was admitted that there were no men on night guard and that the cattle were not tied down; that if they got the "wanderlust", the cowboys would wait until morning to look for them. One witness, when asked: "Q. What precautions did you take to see that the cows did not stray away, after your last patrol, when you went to bed at night?" testified, "A. Simply ride around them and keep on the outside of them, and when they get too far, bring them back. Q. You mean you went about eight or nine o'clock

down there each night? A. Yes. Q. You had no watchman or men that stayed on watch all night? A. No, sir. Q. Well, was there any means of knowing or telling that these cows might stray away at night, as well as in the day time? A. No, sir.''

How the cow of appellant involved in this accident arrived on the road was not explained, although one witness testified that her tracks indicated that she had gotten into the territory west of the highway and thence wandered out through an open gate. However, it was not incumbent upon plaintiffs to prove how that particular animal reached the road. The evidence warranted the inference that the animal had strayed from the rest of the herd and the jury was warranted in believing that appellant had failed to show that it exercised that ordinary care and caution in the management and control of its cattle which would have prevented the straying. We venture to say that in scarcely a case of this character could a plaintiff prove directly by what particular act of negligence any one animal had been permitted to stray to the road. But the presence of the cow on the highway in violation of the statute made a *prima facie* case and placed upon appellant the burden of proceeding and producing evidence to rebut said *prima facie* case. Under any but exceptional circumstances, the exercise of ordinary care and safeguards will serve to keep unattended animals off the roads. (*Kenney* v. *Antonetti, supra.*) In this case there was sufficient evidence to support the implied finding of the jury that appellant had failed to take proper precautions to prevent straying on the road at night. The need of caution is greater at night than in the daytime because the darkness increases not only the difficulty of watching the cattle but the danger to the motorist as well. (*Olden* v. *Babicora Dev. Co.,* 107 Cal. App. 399 [290 Pac. 1062].) ''In these days of rapid automobile transportation, the extreme hazard to drivers and passengers of animals straying unattended on the roads at night cannot be overestimated. The driver is placed in a well nigh helpless position because of the tendency of an animal to spring out of the darkness in front of a car when blinded or hypnotized by its headlights. Against this contingency drivers should be protected by having our roads clear of such obstructions, and every owner of live-

stock should make an earnest endeavor to so control their movements with due care that the lives of others may not be thereby endangered." (*Kenney* v. *Antonetti, supra,* 211 Cal., at p. 340.)

We are satisfied that as against the inference arising from plaintiffs' *prima facie* case, the jury here fulfilled its duty to weigh and consider appellant's evidence, and its determination of the issue so presented has sufficient support in the record and is conclusive. There was no error in the denial of motions for directed verdict and judgment notwithstanding the verdict.

■ Appellant's final contention is that plaintiff Anderson's conduct amounted to negligence as a matter of law, which was the proximate cause of the accident, in that, at an excessive speed with depressed headlights, he drove blindly into an obstacle on the highway, which he should have seen in time to avoid the collision, and that plaintiff Hernandez was negligent in failing to remonstrate at such conduct. More specifically, appellant asserts that despite plaintiff Anderson's statement that he was only driving about 40 miles an hour, the physical evidence—skid mark on road, overturning of car, distance traveled by it from point of impact, etc.—establised the fact either that he was driving at an excessive speed, which he should have reduced when lowering the beam of his lights, or that he could and should have seen the cow and stopped instead of driving blindly into it. Appellant asserts that plaintiff Anderson's testimony that, with his headlights in depressed position, "they hit the car in front of you about 40 feet" showed that lowering the headlights reduced his range of vision from 700 to 40 feet, thus proving conclusively that the headlights must have been constructed to permit them to be depressed more than three degrees below the level otherwise required by law in violation of section 101 subdivision 7 of the California Vehicle Act (Act 5128, Deering's Gen. Laws, vol. II, p. 2499).

The evidence relied upon by appellant falls far short of that degree of proof which will constitute contributory negligence as a matter of law. At most it created a conflict on issues of fact, to be resolved by the jury. Plaintiff Anderson's car was practically new and was in excellent condition as to lights and brakes; the headlights, when not

depressed, complied with the requirements of the California Vehicle Act. Scientific and technical evidence, based on the physical facts, was adduced, which supported plaintiff Anderson's estimate of the speed at which he was driving. His testimony that he was proceeding in a proper manner, under proper driving conditions, but nevertheless the cow was practically invisible until a moment before the impact, is not incredible and is substantiated by the fact that plaintiff Hernandez and the truck driver testified that neither saw the animal prior to the accident. The visibility other than from headlights, the condition of the atmosphere, the effect of approach of the truck, the color of the cow and its position on the highway, and numerous other factors, were undoubtedly considered by the jury in passing upon the alleged negligence of plaintiff Anderson and its determination of these issues is conclusive.

The difficulty of seeing cattle on the road at night has been recognized in several of the cases above cited. For example, in *Olden* v. *Babicora Dev. Co., supra,* 107 Cal. App. at pp. 415 et seq., the court, discussing a similar claim of contributory negligence, said: ''There was no evidence that the driver of the automobile saw this obstruction on the highway in time to avoid it. We then face the question whether there is any evidence that he should have seen it in time to protect himself and his passengers. In deciding whether the driver of the automobile, in the exercise of due care and with proper headlights, should have seen these cattle on the road, there is involved the conditions then existing, the contour of the road, the degree of darkness, and how the cattle blended in with the landscape. . . . The difficulty of seeing any object on the highway, no matter how perfect a headlight one is using, is recognized by our law, in requiring tail-lights not only on vehicles left standing on the highway, but on vehicles that are moving thereon. In limiting headlights so that their glare shall not destroy the vision of approaching drivers, it has been found necessary to require tail-lights on other vehicles because it has been found by experience that headlights do not always show up obstructions in time to avoid accidents. While there is no law requiring lights on cattle, the practical situation that existed here is apparent. Appellants argue that Payne must have seen the cattle if his

lights complied with the law, and that we must hold his failure to see the cattle in time and to stop, to be negligence as a matter of law. . . . Just where these cattle were and whether the driver of the car should have seen them are questions of fact. Payne may have been negligent under the circumstances, or he may not have been. That he was, may not be said as a matter of law. That question, and the further question of which negligence, if any, was the proximate cause of plaintiff's injuries was properly left to the jury." (See, also, *Hansen* v. *Kemish, supra,* 45 A. L. R., at p. 565; *Frowd* v. *Marchbank,* 154 Wash. 634 [283 Pac. 467, 470].)

As in the case just cited, so in this case it cannot be said that plaintiff Anderson was negligent as a matter of law. There was no evidence of any negligence on the part of his guest, plaintiff Hernandez. (*Olden* v. *Babicora Dev. Co., supra,* 107 Cal. App., at pp. 417, 418.)

The judgments are and each of them is affirmed.